STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO: CV-10-337

DOROTHY STANLEY, by her parent
and legal guardian Laurie Stanley,

Plaintiff,

v.

SPURWINK SERVICES, INC.,

Defendant.

ORDER ON MOTION FOR
DISMISSAL

Plaintiff Dorothy Stanley, by her parent and legal guardian Laurie Stanley,

brought this multi-count complaint alleging that the plaintiff was raped by two

men due to the negligence of five of Spurwink Services' employees. Defendant

Spurwink Services, Inc., argues that Ms. Stanley's claims are subject to the

provisions of the Maine Health Security Act, and moves to dismiss this action

because the plaintiff has not filed a mandatory notice of claim and because her

claims are time barred.

## BACKGROUND

Ms. Stanley's complaint alleges the following. Plaintiff Dorothy Stanley is

a twenty-two year old woman with developmental disabilities. (Compl. ¶ 6.) She

has been diagnosed with disruptive behavior disorder, bipolar disorder,

depressive disorder, and mental retardation. (Compl. ¶ 6.) In 2002, when Ms.

Stanley was age fourteen, her emotional and psychological development was

commensurate with that of a child between the ages of four and six. (Compl. ¶ 7.)

Dr. Charles B. Whitehead evaluated Ms. Stanley and wrote: "Although she is

1

emotionally extremely immature, her physical development is consistent with her chronological age, and she is seeking to live a lifestyle (adolescent) that she is entirely incapable of reasonably negotiating." (Compl. ¶ 8.)

Ms. Stanley was living in a therapeutic group home in Biddeford in the years of 2003 and 2004. (Compl. ¶ 9.) Starting in the 2003-2004 school year, the Biddeford School Department placed Ms. Stanley at the Cummings School, operated by Spurwink Services,[1] for day treatment.[2] (Compl. ¶ 9; M. Dismiss Ex. C at 1.) Before she began attending the school, Spurwink was made aware of Ms. Stanley's "risk of elopement in the community" and that sexual abuse would likely result if she did escape into the community without supervision. (Compl. ¶ 10.)

On January 26, 2004, Ms. Stanley's "Pupil Evaluation Team" (PET) met to discuss and develop an Individual Service Plan for her while at the school. (Compl. ¶¶ 11, 13.) At this meeting, the PET discussed the risks involved with transporting Ms. Stanley by bus from her group home to the Cummings School. (Compl. ¶ 11.) The Individual Service Plan describes the appropriate level of supervision for Ms. Stanley as:

> Eyesight supervision, within ear shot due to inability to maintain safety. Due to history of trauma and sexualized behavior, [Ms. Stanley] is not to be left alone with male staff and it is recommended in any situation to have two staff available due to [Ms. Stanley's] quick escalation to aggressive behaviors when upset.

---

[1] The parties refer to the "Cummings School" and the "Spurwink School" interchangeably.

[2] The complaint quotes extensively from what it labels as the January 26, 2004 Spurwink School Individual Service Plan. The defendant submitted a copy of this plan for the court's consideration with its motion to dismiss. The court may consider the plan without converting the motion into one for summary judgment because the complaint refers to this document and there is no question as to its authenticity. *Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶¶ 9-11, 843 A.2d 43, 47-48.

2

(Compl. ¶ 13; M. Dismiss Ex. C at 1.) Two days later another meeting was held to discuss Ms. Stanley's service plan. (Compl. ¶ 14.) At that meeting, the director of Ms. Stanley's group home wrote the following:

> [Ms. Stanley] has had several incidents of exiting off the school bus and eloping in to the community. This has put her at risk. The school department has placed two aides on the bus, however if [Ms. Stanley] gets off the bus, the aides are not permitted to leave the bus. The Team does not feel that the bus is a safe situation for [Ms. Stanley] at this time and feel that [Ms. Stanley] needs to have a safer situation. At this time, [Ms. Stanley] is not happy about going to school with staff, however her Team feels that her unsafe behavior must be a priority.

(Compl. ¶ 14.) Prior to November 2004, on several occasions Ms. Stanley did leave or attempt to leave the Cummings School's grounds and had to be pursued or restrained by Spurwink staff. (Compl. ¶ 15.)

On November 29, 2004, Ms. Stanley rode the bus from her group home to the Cummings School per her usual routine. (Compl. ¶ 16.) She was sixteen years old at this time. (Compl. ¶ 16.) At approximately 8:00 a.m., she exited the bus at the Cummings School where she was met by Robert Cooke and Aaron Sawyer, two educational technicians employed by Spurwink. (Compl. ¶ 17.) Mr. Cooke and Mr. Sawyer were to meet the bus when it arrived and ensure that Ms. Stanley remained on school grounds under close supervision. (Compl. ¶ 18.)

According to Spurwink's Incident Report, on exiting the bus Ms. Stanley informed Mr. Cooke that she was "not going to school." (Compl. ¶ 19.) She then left the school's grounds on foot, traveling in the direction of Washington Avenue. (Compl. ¶ 19.) Neither Mr. Cooke nor Mr. Sawyer followed Ms. Stanley off the property. (Compl. ¶ 20.) Instead, Mr. Cooke borrowed Mr. Sawyer's cell phone to call Wayne Holden. (Compl. ¶ 20.) Mr. Holden was employed by Spurwink as a teacher at the Cummings School, and is listed as one of the

3

individuals who attended the January 26, 2004 meeting to discuss Ms. Stanley's Individual Service Plan. (Compl. ¶ 20; M. Dismiss Ex. C at 1.)

Ms. Stanley could be seen crossing Ocean Avenue in the direction of Washington Avenue by the time Mr. Holden arrived outside the school. (Compl. ¶ 21.) Mr. Holden, like Mr. Cooke and Mr. Sawyer, declined to follow Ms. Stanley off the grounds. (Compl. ¶ 22.) Instead, he instructed Mr. Sawyer to call Robin Herrick associate director of the Cummings School, and Piper Carey, a generalist at the school. (Compl. ¶ 22.) Ms. Herrick and Ms. Carey were both employed by Spurwink, and Ms. Herrick had attended the January 26, 2004 meeting with Mr. Holden. (Compl. ¶ 22; M. Dismiss Ex. C at 1.) While the calls were being made, Ms. Stanley could be seen entering the Cigarette Shopper, a retail operation on the far side of Washington Avenue. (Compl. ¶ 23.)

By the time Ms. Herrick joined the men outside the school, Ms. Stanley was no longer visible. (Compl. ¶ 24.) Ms. Herrick and Mr. Holden left the school in a car to search for Ms. Stanley, but were unable to find her and were instructed to return to the school after a few minutes. (Compl. ¶¶ 25–26.) Ms. Carey called the police, and Ms. Stanley's mother was notified at approximately 8:15 a.m. (Compl. ¶ 27.) Ms. Stanley reappeared at her group home in Biddeford the next day, November 30, 2004. (Compl. ¶ 28.)

On her return, Ms. Stanley informed the group home staff that she had been sexually assaulted, and later reported two sessions of oral and vaginal penetration by two different men, with a shower between the two events. (Compl. ¶¶ 29–30.) An examination at Maine Medical Center confirmed that she had been assaulted, and revealed that her left nipple had been torn. (Compl. ¶¶ 31–32.) Ms. Stanley has exhibited signs of psychological damage as a result of

4

this incident. (Compl. ¶¶ 35–36.) On July 28, 2010, Ms. Stanley filed a five-count complaint against Spurwink Services to recover for damages arising out of the November 29, 2004 incident.

## DISCUSSION

"A motion to dismiss tests the legal sufficiency of the complaint." *Heber v. Lucerne-in-Maine Village Corp.*, 2000 ME 137, ¶ 7, 755 A.2d 1064, 1066 (quoting *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994)). The court examines "the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* (quoting *McAfee*, 637 A.2d at 465). "For purposes of a 12(b)(6) motion, the material allegations of the complaint must be taken as admitted." *McAfee*, 637 A.2d at 465. "Dismissal is warranted when it appears beyond a doubt that the plaintiff is entitled to no relief under any set of facts that [s]he might prove in support of [her] claim." *Johanson v. Dunnington*, 2001 ME 169, ¶ 5, 785 A.2d 1244, 1245–46.

Spurwink Services moves to dismiss Ms. Stanley's claims as being time-barred by the statute of limitations contained in the Maine Health Security Act (MHSA). The MHSA requires all actions by a minor for professional negligence to "be commenced within 6 years after the cause of action accrues or within 3 years after the minor reaches the age of majority, whichever first occurs." 24 M.R.S. § 2902 (2004). Ms. Stanley's Individual Service Plan indicates that she was born on April 11, 1988, meaning that the she turned eighteen on April 11, 2006. (M. Dismiss Ex. C. at 1.) The statute of limitations would have run on any claims subject to the MHSA on April 11, 2009, more than a year before this action was initiated.

5

The MHSA's "[s]tatute of limitations for health care providers and health care practitioners" applies to "[a]ctions for professional negligence . . . ." 24 M.R.S. § 2902. The law defines an "[a]ction for professional negligence" to mean "any action for damages for injury . . . against any health care provider, its agents or employees . . . whether based upon tort or breach of contract or otherwise, arising out of the provision or failure to provide health care services." 24 M.R.S. § 2502(6) (2004). The Law Court has described this definition as "very broadly worded and all-encompassing," reflecting "a legislative intent that the MHSA 'occupy the field with regard to actions against health care providers.'" *Saunders v. Tisher*, 2006 ME 94, ¶¶ 9, 13, 902 A.2d 830, 833 (quoting *Musk v. Nelson*, 647 A.2d 1198, 1201 (Me. 1994)).

A "[h]ealth care provider" is "any hospital, clinic, nursing home, or other facility in which skilled nursing care or medical services are prescribed by or performed under the general direction of persons licensed to practice medicine . . . in this State and which is licensed or otherwise authorized by the laws of this State." 24 M.R.S. § 2502(2) (2004). This definition includes facilities that treat mental illness. *Saunders*, 2006 ME 94, ¶ 14, 902 A.2d at 834.

Spurwink argues that it is a health care provider within the meaning of the statute. At the time of the incident, the Spurwink School did hold a Mental Health Agency license from Maine's Department of Health and Human Services.[3] (M. Dismiss Ex. F.) This does not, however, show that "skilled nursing care or medical services" were in fact being "prescribed by or performed under the general direction" of licensed medical practitioners at the school. Furthermore, the complaint and the public documents placed in the record do

---

[3] The license is a public document that may be considered on a motion to dismiss. *Moody*, 2004 ME 20, ¶¶ 9–11, 843 A.2d at 47–48.

not show that Ms. Stanley was placed in the Cummings School to receive such care and treatment.

On a motion to dismiss, the court's review is narrow and deferential to the plaintiff. It would be premature to determine conclusively whether the Cummings School was a health care provider or whether Ms. Stanley's presence there was connected to the provision of health care services, based solely the complaint and few extraneous documents properly before the court at this stage of proceedings.

**The entry is:**

Defendant Spurwink Services' motion to dismiss is denied.

DATE: April 20, 2011

Roland A. Cole
Justice, Superior Court

LAURIE STANLEY (PARENT & GUARDIAN OF DOROTHY STANLEY) VS SPURWINK SERVICES INC
UTN:AOCSsr  -2010-0070819                    CASE #:PORSC-CV-2010-00337
---------------------------------------------------------------------------

01 0000001195          LAVOIE, MARK
     415 CONGRESS STREET PO BOX 4600 PORTLAND ME 04112-4600
     F     SPURWINK SERVICES INC                    DEF        RTND     08/09/2010

02 0000009777          DOUGLAS, THOMAS L
     75 PEARL STREET PO BOX 9785 PORTLAND ME 04104-5085
     F     LAURIE STANLEY (PARENT & GUARDIAN)       PL         RTND     07/12/2010
     F     DOROTHY STANLEY                          PL         RTND     07/12/2010

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO: CV-10-337/
RAC - Cum- 5/3/2012

DOROTHY STANLEY,
by her parent and legal guardian
LAURIE STANLEY

Plaintiff,

v.

SPURWINK SERVICES, INC.

Defendant.

STATE OF MAINE
Cumberland,ss,Clerk's Office
ORDER

MAY 0 3 2012

RECEIVED

There are two motions before the court: the defendant's Motion for Summary Judgment and the defendant's Motion to Compel. Due to the disposition of the case through the Motion for Summary Judgment the court does not consider the Motion to Compel at this time.

## BACKGROUND

This cause of action is based on Dorothy Stanley's allegation "that Spurwink Services, Inc., [(Spurwink)] breached its duty of care to her and allowed her to elope from its Cummings Program on November 29, 2004, allegedly resulting in a sexual assault by two strangers who she met while out of Spurwink's custody." (S.M.F. ¶ 1.) Ms. Stanley has been diagnosed with a number of disabilities and disorders and was living at Community Partners, a therapeutic group home in Biddeford. (S.M.F. ¶¶ 2, 3.) She attended the Cummings Program, which is an education services/day treatment program operated by Spurwink. (S.M.F. ¶¶ 4, 5.) When Ms. Stanley was admitted to the Cummings Program, Laurie Stanley claims she understood that Spurwink provided a range of services to her daughter and that her daughter needed special care. (S.M.F. ¶¶ 83, 84.)

1

Spurwink is a duly accredited organization that provides behavioral health, educational, and residential services for children, adolescents, adults and families. (S.M.F. ¶ 21, 22 as qualified by Opp. S.M.F. ¶ 21.) The Cummings Program has operated in Portland since 1998 and it provides education in a highly structured therapeutic environment for 13-20 year olds with behavioral and developmental challenges. (S.M.F. ¶¶ 23, 24 as qualified Opp. S.M.F. ¶¶ 23, 24.) The program offers residential homes and a day treatment and educational center. (S.M.F. ¶ 24.) Individuals in the program have various disabilities and disorders. (S.M.F. ¶ 25.)

In order to be admitted to the program a student must have a serious disorder that requires a higher level of service than what public schools can offer. (S.M.F. ¶ 26.) Ms. Stanley's records indicate that she was admitted to the day treatment program because "she had a serious disorder that could benefit from a day treatment setting, public school was an inadequate placement for her and could not meet her needs, and she had a history of behavior that was harmful to herself or others." (S.M.F. ¶ 28.)

After she was admitted, Spurwink developed an individualized treatment or service plan (ISP) for Ms. Stanley. (S.M.F. ¶¶ 32–35.) Dr. Timothy Waite, a consulting psychiatrist for Spurwink, assisted in developing the ISP. (S.M.F. ¶ 35.) As part of his evaluation, Dr. Waite noted Ms. Stanley's history of mental disabilities and her prior discharge from a residential treatment at Lake View. (S.M.F. ¶ 36.) He also noted that she had a history of sexualized behaviors and running away. (S.M.F. ¶¶ 37–38.) Based on his evaluations Dr. Waite developed diagnoses and suggested a list of treatments. (S.M.F. ¶¶ 39–41.) This evaluation served as a basis for the ISP.

In 2004 a new ISP was developed for Ms. Stanley. Many individuals from Spurwink were present for Ms. Stanley's new ISP development in order to determine if her continued placement there was appropriate. (S.M.F. ¶¶ 42–47.) Dr. Waite

2

approved the ISP and Spurwink put procedures in place to follow it and track Ms. Stanley's development. (S.M.F. ¶¶ 61-66.) A plan for Ms. Stanley's supervision was also developed, but the parties dispute when the plan was developed and who was involved with the development. Additionally, Spurwink established a safety plan that included individualized elopement response procedures. (S.M.F. ¶¶ 66–67.)

"On November 29, 2004, at approximately 8 a.m., Ms. Stanley arrived at the Cummings Program and immediately told one of Spurwink's employees, Robert Cook, that she was 'not going to school.'" (S.M.F. ¶ 11.) She then left and walked towards Payson Park. (S.M.F. ¶ 12.) Mr. Cook alerted others to the situation and several employees quickly left to pursue her; it is unclear who was involved in the search. (S.M.F. ¶¶ 13, 14, 91, 92 qualified by Opp. S.M.F. ¶ 13, 91, 92; Add'l S.M.F. ¶ 7.) These employees were unable to locate Ms. Stanley that day. (S.M.F. ¶ 15.)

Ms. Stanley, who was sixteen at the time of this incident, alleges that after she left the program she approached a vehicle and the male in the car invited her into the vehicle. (S.M.F. ¶¶ 16, 19.) "Ms. Stanley alleges that she and the stranger had sexual intercourse in Payson Park and then went to an apartment, where she had sexual contact with him and a friend of his." (S.M.F. ¶ 17.) After spending the night at the apartment, the men took her to a social services agency and she was returned to her group home. (S.M.F. ¶ 18.) Ms. Stanley claims that she did not consent to the intercourse and suffered harm as a result of her elopement. (S.M.F. ¶ 20.)

Mr. Cook testified that he did not know of any special protocol regarding Ms. Stanley, but he was required to be familiar with her ISP and safety plan. (Add'l S.M.F. ¶¶ 20–28 as qualified by Opp. Add'l S.M.F. ¶¶ 20–28.) His exact actions and intentions that day are unclear from the facts provided. (Add'l S.M.F. ¶ 37, 39–41.) Also, it is unclear if there were enough Spurwink employees greeting students as they got off the

buses on the day of the elopement, partly because it is unclear how many people are needed for bus duty. (Add'l S.M.F. ¶¶ 30–32, 34, 36.) Spurwink personnel agree that they have a duty to keep a student safe generally. (Add'l S.M.F. ¶ 42.)

## DISCUSSION

### 1. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653. "A genuine issue of material fact exists when there is sufficient evidence to require a fact-finder to choose between competing versions of the truth at trial." *Inkell v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745 (quoting *Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 2, 845 A.2d 1178). Any ambiguities must be resolved in favor of the non-moving party. *Beaulieu v. The Aube Corp.*, 2002 ME 79, ¶ 2, 796 A.2d 683.

### 2. Maine Health Security Act

The defendant argues that the allegations in the plaintiff's complaint fall within the scope of the Maine Health Security Act. (Mot. Summ. J. 3.) Therefore, the court does not have jurisdiction over the claim because a malpractice advisory panel must screen the case prior to litigation. (*Id.*); 24 M.R.S. § 2903(1) (2011).[1] In order to fall within the scope of this statute the case must be an action for professional negligence.

The law defines an "[a]ction for professional negligence" to mean "any action for damages for injury . . . against any health care provider, its agents or employees

---

[1] "No action for professional negligence may be commenced until the plaintiff has:
   A. Served and filed written notice of claim in accordance with section 2853;
   B. Complied with the provisions of subchapter IV-A [24 M.R.S.A. § 2851 et seq]; and
   C. Determined that the time periods provided in section 2859 have expired."
24 M.R.S. § 2903 (2011). These provisions require involvement of the mandatory pre-litigation screening and mediation panels.

4

. . . whether based upon tort or breach of contract or otherwise, arising out of the provision or failure to provide health care services." 24 M.R.S. § 2502(6) (2011). The Law Court has described this definition as "very broadly worded and all-encompassing," reflecting "a legislative intent that the MHSA 'occupy the field with regard to actions against health care providers.'" *Saunders v. Tisher*, 2006 ME 94, ¶¶ 9, 13, 902 A.2d 830 (quoting *Musk v. Nelson*, 647 A.2d 1198, 1201 (Me. 1994)); *see also Olszewski v. Mayo Reg'l Hosp.*, 2008 U.S. Dist. LEXIS 99887, *10 (D. Me. Dec. 9, 2008) (noting the expansive reach of the MHSA).

A "[h]ealth care provider" is "any hospital, clinic, nursing home, or other facility in which skilled nursing care or medical services are prescribed by or performed under the general direction of persons licensed to practice medicine . . . in this State and that is licensed or otherwise authorized by the laws of this State." 24 M.R.S. § 2502(2) (2011). This definition includes facilities that treat mental illness. *Saunders*, 2006 ME 94, ¶ 14, 902 A.2d 830.

The plaintiff argues that this case does not fall within the ambit of MHSA because it merely involves a private school and the poor judgment of Mr. Cook, who is not a medical professional. (Opp. Mot. Summ. J. 11, 13.) The defendant retorts that the Cummings Program is not merely a private school, but is instead a private Special Purpose program approved by the Maine Department of Education. (Reply 1.) As such, it provides special education and supportive services and it has a day treatment programs with educational components. (Reply 2.) Additionally, Spurwink is able to receive reimbursements for health services, as defined by MaineCare regulations. (*Id.*) Some of these reimbursements apply to services performed in order to develop the student's ISP. (*Id.*) The defendant also argues that Ms. Stanley's ISP and her safety plan

5

were developed in response to her mental health needs. (Reply 3.) Based on Spurwink's certifications and the services it offers it is a health care provider.

Since Spurwink is a health care provider and the parties do not dispute that the damages are based on tort, therefore, the remaining question is whether those damages arise "out of the provision or failure to provide health care services." 24 M.R.S. § 2502(6) (2011).

> The Law Court has broadly defined "health care" for purposes of the MHSA as:
>
> preventative, diagnostic, therapeutic, rehabilitative, maintenance or palliative care, services, treatment, procedures or counseling . . . that affects an individual's physical, mental or behavioral condition . . . . Health care includes prescribing, dispensing or furnishing to an individual drugs, biologicals, medical devices or health care equipment and supplies.

*Saunders*, 2006 ME 94, ¶ 11, 902 A.2d 830 (quoting 22 M.R.S. § 1711-C(1)(C) (2005)).

Both parties rely on *Thayer v. Jackson Brook Institute, Inc.*, 584 A.2d 653 (Me. 1991), where a woman was attacked by a female patient while visiting her son in a locked unit at the defendant institute. *Id.* at 653. The attacker's treating physicians had ordered that she be kept under constant observation, meaning that staff would maintain visual contact and never be further than six steps away. *Id.* The registered nurse on duty had discretion to adjust the level of observation. *Id.* at 653–54. On the day of the attack, the nurse assigned to the attacker had determined that it would be proper under the circumstances to allow the attacker out of sight for a short period of time. *Id.* at 654. The attack occurred within this short period. *Id.*

In *Thayer* the issue on appeal was whether the injuries the attacker inflicted on the visiting woman arose out of patient care. *Id.* The plaintiff argued that the gravamen of her complaint was "premises liability rather than professional negligence" and thus not subject to the MHSA. *Id.* The Court rejected this argument. It reasoned:

6

> Contact with nonpatients was an essential part of [the institute's] program of psychiatric care . . . . [The defendant's] alleged negligence thus cannot be divorced from the program of care this patient was receiving. If [the defendant] had a duty to protect [the plaintiff] while she was visiting its premises, that duty was executed by those who evaluated the patients and prescribed their relative freedom to interact with visitors. In this case the decision to allow both supervised and unsupervised contact with outsiders was made by persons who were caring for the assailant.

*Id.* The decision thus arose out of patient care and was subject to the limitations of the MHSA. *Id.*

The plaintiff argues that *Thayer* is distinguishable because the claims arose from the alleged negligence of a *nurse* in exercising her professional judgment while employed at a *psychiatric hospital*. Overall, she argues "Spurwink's failures on November 29, 2004 had nothing to do with [Ms. Stanley's] individualized 'treatment' plan, but instead involved: 1. general administrative policies and procedures applicable to all of the students; and 2. the poor non-professional judgment of Mr. Cook, who cannot be classified as a health care provider or practitioner under the MHSA." (Opp. Mot. Summ. J. 15-16.) The court finds that these arguments do not completely distinguish this case from *Thayer*.

It is not clear that the nurse's professional status influenced the outcome in *Thayer*. Instead it related to the implementation of the patient's treatment plan. Here, the alleged negligence arose out of the failure to implement either the program's policies or Ms. Stanley's treatment or safety plan. Since Spurwink is a health care provider all of these plans are part of its overall goal of providing health care services. The fact that these policies may also assist in providing educational services is immaterial since all of the policies, at least in part, are in place to provide a safe and therapeutic environment for the students in the program.[2]

---

[2] The plaintiff argues that Mr. Cook was simply using common sense when he acted. Simply because an action is common sense does not exclude it from also being professional judgment.

7

Since the defendant is a health care provider and its duty to Ms. Stanley arose from the provision of health care services, Ms. Stanley's claims arise from "the provision or failure to provide health care services." 24 M.R.S. § 2502(6) (2011). Her complaint is therefore an action for professional negligence subject to the limitations of the MHSA. 24 M.R.S. §§ 2902, 2903 (2011); (S.M.F. ¶ 79.) The plaintiff has not followed the procedure required by this act, so the court does not currently have jurisdiction over the case.

**The entry is:**

The Defendant's Motion for Summary Judgment is **GRANTED**.

DATE: _May 3, 2012_

Roland A. Cole
Justice, Superior Court

8

LAURIE STANLEY (PARENT & GUARDIAN OF DOROTHY STANLEY) VS SPURWINK SERVICES INC
UTN:AOCSsr -2010-0070819                           CASE #:PORSC-CV-2010-00337
--------------------------------------------------------------------------

01 0000001195 ATTORNEY LAVOIE, MARK
_____415 CONGRESS STREET PO BOX 4600 PORTLAND ME 04112-4600_____
____F____SPURWINK SERVICES INC_____DEF_____RTND____08/09/2010___

02 0000009777 ATTORNEY DOUGLAS, THOMAS L
_____75 PEARL STREET PO BOX 9785 PORTLAND ME 04104-5085_____
____F_FOR_LAURIE STANLEY (PARENT & GUARDIAN)____PL_____RTND____07/12/2010___
____F_FOR_DOROTHY STANLEY_____PL_____RTND____07/12/2010___